**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION**

**IPSCO TUBULARS, INC.
d/b/a TMK IPSCO**                                                                                    **PLAINTIFF**

v.                            **CASE NO. 3:10CV00021 BSM**

**AJAX TOCCO MAGNETHERMIC
CORPORATION**                                                                                        **DEFENDANT**

## ORDER

Defendant Ajax Tocco Magnethermic Corporation's ("Ajax") moves for partial summary judgment [Doc. No. 89] and plaintiff IPSCO Tubulars, Inc. d/b/a TMK IPSCO ("IPSCO") objects. [Doc. Nos. 94, 95, 99]. For the following reasons, Ajax's motion is granted in part and denied in part.

### I. FACTUAL BACKGROUND

The facts, when viewed in the light most favorable to IPSCO, are as follows. In March of 2006, Ajax submitted a bid to IPSCO for austenitizing and quenching equipment to be used in IPSCO's new tubular heat treating facility in Blytheville, Arkansas. Although Dr. Steve Hansen, IPSCO's chief metallurgist, and Dom Perotta, the project manager for IPSCO, wanted a better quench design than what Ajax proposed, IPSCO accepted Ajax's bid for the contract because it was the lowest acceptable bid. The contract, which provided that its terms could only be changed by a written change order, was signed on April 7, 2006, and required Ajax to provide induction heating, quenching and material handling equipment for the Blytheville facility.

Ajax knew that IPSCO intended to use the equipment to heat-treat steel pipe, which it would then sell. To be marketable to IPSCO's customers, the treated pipe had to meet the specifications of the American Petroleum Institute ("API"). Specifically, the treated pipe could not contain quench cracks. In September of 2006, IPSCO became aware of quench cracking issues at its Calgary facility, which used certain Ajax parts. As a result, IPSCO became concerned that the Blytheville equipment would also produce quench cracks in the pipe processed through it. Ajax assured IPSCO that it had experience in supplying induction heating lines capable of producing tubing and casing to API specifications. In October of 2006, IPSCO and Ajax began discussing possible solutions to fix the quenching issues at the Calgary facility and to prevent similar issues at the Blytheville facility. As a result of these concerns, IPSCO executed a written change order for the Blytheville equipment which increased the spacing between the austenitizing and quenching units.

The Ajax equipment was delivered to the Blytheville facility in May of 2007. It was then installed by an outside engineering contractor hired by IPSCO. From the beginning of its use and testing, the system experienced a range of problems from drainage issues to quench cracking in the piping. IPSCO and Ajax disputed the source of the problems. The parties conducted several performance tests over the following months and made several attempts to correct the issues. One performance test, conducted in October of 2008, demonstrated that the Ajax equipment was capable of meeting the temperature and production rate requirements contained in the contract. IPSCO states, however, that, attempts at operating the equipment at the production rates specified in the contract produced

high rates of pipe containing quench cracks.

The contract also required Ajax to provide a letter of credit to IPSCO that IPSCO could draw upon in order to secure Ajax's performance. Under the contract, Ajax was required to supply the $600,000 letter of credit when it applied for final payment. The letter was to remain open for one year from the date that IPSCO issued a preliminary acceptance certificate and made the final installment payment for the Ajax equipment. When Ajax's final payment invoice was due, its controller, Darlene Hoso, sent a form letter of credit to IPSCO's in-house legal counsel, Jimmy Briseno, for his review. The draft letter of credit contained a proposed expiration date of January 19, 2009, and required IPSCO to wire the final payment to the issuing bank, JP Morgan, rather than directly to Ajax. It also required IPSCO to submit a signed statement by an authorized representative before it could draw upon the letter. Briseno objected to the thirty day notice period, but did not object to the draft letter's remaining contents. The parties subsequently agreed to a fourteen day notice period, and Ajax issued an irrevocable standby letter of credit on February 13, 2008.

IPSCO initially refused to issue the preliminary acceptance certificate and make the final payment because of the dispute about the performance issues at the Blytheville facility. On March 13, 2008, after Ajax placed a hold on IPSCO's spare parts orders that were necessary to keep its other facilities functioning, IPSCO made the $1.2 million final payment by check directly to Ajax. In December of 2008, IPSCO decided to draw upon the letter of credit, and Noah Popp, IPSCO's vice-president, was told by JP Morgan that the letter was not funded. IPSCO states that after receiving payment, Ajax refused to notify the bank that

the letter should be funded, and it expired on January 19, 2009, before IPSCO could draw upon it.

IPSCO sued Ajax on February 1, 2010, and amended its complaint on March 21, 2011, alleging breach of contract, gross negligence, and constructive fraud. Ajax now moves for summary judgment on the breach of contract and constructive fraud claims.

## II. LEGAL STANDARD

Summary judgment is appropriate when the record, viewed in a light most favorable to the nonmoving party, demonstrates that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *Se*e Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 249-50 (1986). Once the moving party demonstrates that there is no genuine dispute of material fact, the non-moving party may not rest upon the mere allegations or denials in his pleadings. *Holden v. Hirner*, 663 F.3d 336, 340 (8th Cir. 2011). Instead, the non-moving party must produce admissible evidence demonstrating a genuine factual dispute that must be resolved at trial. *Id.* Importantly, when considering a motion for summary judgment, all reasonable inferences must be drawn in the light most favorable to the nonmoving party. *Holland v. Sam's Club*, 487 F.3d 641, 643 (8th Cir. 2007). Additionally, the evidence is not weighed, and no credibility determinations are made. *Jenkins v. Winter*, 540 F.3d 742, 750 (8th Cir. 2008).

## III. DISCUSSION

Ajax moves for summary judgment, stating that there is no evidence that it breached

its contractual obligations. It also states that there is no basis for IPSCO's constructive fraud claim. As discussed below, summary judgment is denied as to the breach of contract claim and granted as to the constructive fraud claim.

A.   Breach of Contract

Ajax's motion for partial summary judgment on the breach of contract claim is denied because there are material factual disputes that must be decided in determining whether the contract was breached.

*1. Performance Requirements*

Under Arkansas law, a breach of contract claim requires: (1) the existence of a enforceable contract between the parties; (2) an obligation on the part of the defendant; (3) a breach of that obligation; and (4) damages resulting from the breach. *Rabalaias v. Barnett*, 683 S.W. 2d 919, 921 (Ark. 1985). The issue in this case centers on determining what Ajax's obligations were under the contract. The parties agree that Ajax was required to supply IPSCO with a system for heat-treating pipe and tubing that met certain heating, cooling, and production rates, and that also had the capability (if correctly installed, maintained and operated) of producing properly heated and cooled pipe and tubing, enhanced with physical properties that met API specifications.

Ajax argues that it is entitled to summary judgment because it fulfilled its contractual obligations by supplying IPSCO with such a system. Ajax states that the performance issues at the Blytheville facility, and the resulting pipe defects, were not due to the Ajax equipment but were rather the result of IPSCO's own actions. It also argues that the contract does not

require it to ensure that the final product met API specifications. Ajax further argues that it could not have made such a guarantee because the production of higher grades of API pipe requires three separate stages of austenitizing, quenching, and tempering, and Ajax only supplied the equipment for the austenitizing and quenching stages to IPSCO.

While IPSCO argues that API specifications were in fact part of the contract, it is unnecessary to decide that here. As a foundational issue, the parties agree that Ajax was required to supply IPSCO with a system capable of producing properly heated and cooled pipe and tubing, and there are factual issues in dispute as to whether Ajax supplied such a system. Ajax provides evidence that its system did, during one performance test, meet the heating and cooling requirements and the maximum production rate specified in the contract. IPSCO, however, has also provided evidence, including internal Ajax emails, that raise a genuine issue of fact as to whether the Ajax system was ultimately capable of producing properly treated product. While it is undisputed that the Blytheville plant experienced production problems from the outset, the parties offer two competing versions of the events that created those problems. After viewing the facts in a light most favorable to IPSCO, the non-moving party, this case is not appropriate for summary judgment because there remain factual issues in dispute. As a result, summary judgment is denied.

### 2. *Letter of Credit*

Ajax's motion for partial summary judgment is also denied with regard to the letter of credit. Ajax provides evidence that it did fund the letter of credit, and states that IPSCO's inability to draw on it was the result of its own failure to fulfill certain requirements, such as

6

wiring the final installment payment to JP Morgan and submitting a signed statement. Ajax states that IPSCO's failure to object to these requirements in the draft letter of credit submitted to Briseno made the requirements binding on IPSCO. Ajax also argues that because Briseno did not object to the draft letter's proposed expiration date of January 19, 2009, Ajax was not obligated to keep the letter open for the full twelve-month period required under the contract. Further, Ajax states that IPSCO was at fault because it relied on the statement of an unnamed bank official that the letter was not funded and made no further attempts to either draw on the letter before it expired or to provide the required documentation to the bank.

IPSCO argues that Ajax did not have the right to impose these requirements, absent a written change order as required by the contract. It also provides evidence that it made the payment directly to Ajax because Ajax refused to ship IPSCO's spare parts orders, which were necessary to keep other IPSCO facilities running, until it received the payment. IPSCO contends that even after receiving the final payment, Ajax deliberately refused to notify the issuing bank that IPSCO had satisfied the conditions required before it could draw upon the letter. Moreover, IPSCO states that even when it notified Ajax in December of 2008, two months before the letter was set to expire, that it could not draw upon it, Ajax still refused to notify the bank that payment had been received so that IPSCO could draw upon it.

It is clear that there are factual issues in dispute with regard to the letter of credit and the parties' obligations under the contract. Accordingly, summary judgment is denied as to this issue.

B.     Constructive Fraud

Summary judgment is granted as to IPSCO's constructive fraud claim. To establish fraud under Arkansas law, IPSCO must establish: (1) a false representation of a material fact; (2) knowledge that the representation is false or that there is insufficient evidence upon which to make the representation; (3) intent to induce action or inaction in reliance upon the representation; (4) justifiable reliance on the representation; and (5) damages suffered as a result of the reliance. *Yarborough v. DeVilbiss Air Power, Inc.*, 321 F.3d 728, 730 (8th Cir. 2003). While constructive fraud does not require that a plaintiff prove fraudulent intent, it does require the existence of a confidential or special relationship between the parties. *Id.*

IPSCO cannot establish that it had a special relationship with Ajax. IPSCO argues that such a relationship existed because it had done business with Ajax since the 1990's and because it relied on Ajax's knowledge when purchasing equipment. Even if IPSCO's statements are taken as true, this is insufficient to create a special relationship. This is the case because it is undisputed that IPSCO retained its own engineers, metallurgists, and consultants for the Blytheville project. And, even if Ajax had more experience and knowledge about austenitizing and heat quenching equipment than IPSCO, this is insufficient to establish that a special relationship existed between two sophisticated parties involved in an arms-length transaction. *TEC Floor Corp. v. Wal-Mart Stores, Inc.*, 4 F.3d 599, 602 (8th Cir. 1993); *See also Shelton v. Kennedy Funding, Inc.*, 622 F.3d 943, 956 (8th Cir. 2010) (stating that constructive fraud requires more than superior knowledge on the part of one party to the transaction).

Further, even if such a special relationship existed, IPSCO cannot demonstrate that its reliance on Ajax's representations was justified. It is undisputed that IPSCO had concerns about the knowledge and ability of Ajax with regard to quenching from the outset of the parties' relationship. While IPSCO states that it relied on Ajax's later assurances that it could provide a solution to the quenching issues, the uncontroverted evidence demonstrates that even before the contract was signed, IPSCO was unsure that Ajax could provide it with quenching equipment that would meet its needs. Therefore, summary judgment is granted as to IPSCO's constructive fraud claim.

For the foregoing reasons, Ajax's motion for partial summary judgment [Doc. No. 89] is denied in part and granted in part.

IT IS SO ORDERED this 2nd day of April 2013.

_____
UNITED STATES DISTRICT JUDGE