IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

**IPSCO TUBULARS, INC.**                                                            **PLAINTIFF**
**d/b/a TMK IPSCO**

**v.**                  **CASE NO. 3:10CV00021 BSM**

**AJAX TOCCO MAGNETHERMIC**
**CORPORATION**                                                                     **DEFENDANT**

## ORDER

Upon the evidence produced herein, it is concluded that verdict should be entered in favor of IPSCO Tubulars, Inc. ("IPSCO") and against Ajax TOCCO Magnethermic Corporation ("Ajax") in the amount of $5,162,298.55.

### I. BACKGROUND

IPSCO brought suit against Ajax in February of 2010 and amended its complaint on March 21, 2011, alleging breach of contract, gross negligence, and constructive fraud. Partial summary judgment was granted in favor of Ajax on April 2, 2013, dismissing IPSCO's constructive fraud claim. Trial began on May 6, 2013. When IPSCO rested its case on May 15, 2013, Ajax moved for directed verdict on all claims, and IPSCO's claims for gross negligence and punitive damages were dismissed. Ajax presented its case in chief and the trial concluded on May 23, 2013. The parties submitted post-trial briefs and closing arguments were conducted on August 16, 2013.

### II. FINDINGS OF FACT

Having observed the witnesses and reviewed the trial transcript and exhibits, the

findings of fact are as follows. IPSCO, which sells heat-treated pipe for use in the oil and gas industry, originally sent its pipe out to third-party processors for heat-treating. Around 2006, IPSCO constructed a heat-treat facility in Blytheville, Arkansas, in order to increase its profits by heat-treating its pipe in-house. IPSCO submitted bids and specifications to potential vendors for the design of the heat-treating equipment. Ajax, one of the foremost experts at designing and supplying equipment used in heat-treating pipe, was the lowest acceptable bidder. Although some IPSCO employees had concerns about Ajax's ability to provide the equipment, on April 7, 2006, the parties entered into a $6,000,000 contract. The contract required Ajax to provide induction heating, quenching and material handling equipment for the Blytheville facility.

In July of 2007, the equipment was installed. According to IPSCO's Blytheville employees, such as Murray Giesbrecht and Darren Joyner, whose testimony was credible and is given great weight, the Ajax equipment experienced issues immediately upon its startup in September of 2007. Not only did the line fail to process tubing at the contract rate of 96 feet per minute, but attempts at running the line at higher speeds resulted in pipe distorting so badly that it would often become stuck in the quench, requiring IPSCO to shut down the line in order to manually cut out the distorted pipe. Pipe processed with the Ajax equipment also experienced a high rate of defects, including quench cracks and inconsistent hardness measurements throughout a single piece of pipe. These imperfections rendered the pipe unfit for IPSCO's purposes, requiring IPSCO to sell the downgraded pipe at a reduced rate.

In October or November of 2007, Ajax sent Jorn Jensen to the Blytheville facility to assist with startup, and he remained the Ajax spokesperson in charge during all Ajax visits to Blytheville from 2007 to 2009. According to both Jensen and IPSCO's employees, the equipment was capable of producing good results when slowed below the contracted rate of 96 feet per minute down to approximately 35 to 50 feet per minute. During his first visit, Jensen identified three possible design flaws that could be responsible for the production issues: first, that the quench barrels were too large for small diameter pipe; second, that a large unsupported gap in the rolls that supported piping during quenching was too large for small diameter pipe; and third, that a support roll in the quench should have been motorized to help drive pipe through the quench. These design flaws were not discussed with IPSCO.

Ajax also noted that IPSCO had failed to provide a quench flume capable of providing 7,500 gallons per minute of water to the quench as required by the Ajax design. In June of 2008, after ongoing discussions with Ajax, IPSCO enlarged the flume to accommodate the design requirements. Although line speeds slightly improved, the problems continued when IPSCO attempted to run the equipment at 96 feet per minute. In July of 2008, because the equipment continued to perform poorly when operated at the contracted rate, IPSCO notified Ajax that it wanted to conduct performance tests, as allowed by the contract. The performance tests conducted in August, September, and October of 2008, failed. IPSCO then modified the Ajax equipment by opposing the second quench barrel in order to reverse the flow of water in the quench. This modification, which was not permanent, improved the

performance of the equipment, although the equipment was still unable to perform at contracted speeds. During this time period, IPSCO continued to meet its customers' needs by sending pipe to outside processors for heat-treating.

The parties continued to conduct performance tests on the equipment from January through March of 2009. IPSCO allowed Ajax to set the operating parameters for the equipment during those tests. It also performed all maintenance specified by Ajax. None of the performance tests were successful, however, and the equipment never performed consistently at the contractually specified rates. The parties continued to disagree about what prevented the equipment from successfully heat-treating pipe at the contract rate. Ajax faulted IPSCO's maintenance of the equipment, while IPSCO blamed Ajax for design defects in the equipment. Ajax also blamed the issues on a ten-foot gap that IPSCO had requested as an addition to the Ajax design prior to installation, a change that Ajax had agreed to and indicated would not affect the equipment's performance.

To the extent that Ajax has offered testimony in support of its position that all of the processing problems were caused by IPSCO's own internal failures to develop proper operating parameters and material chemistry or to properly maintain the equipment, this testimony is unconvincing when considered alongside the trial exhibits and other more credible testimony. It is clear, however, that even if the Ajax equipment was designed properly, it would have still taken IPSCO time to maximize its productivity. Indeed, Dr. Steven Hansen, an IPSCO employee, testified that IPSCO was responsible for designing its

own chemistries to ensure that its pipe had specific properties after heat-treating. He also testified that designing these "recipes" was a process that could take weeks, months, or even years. This testimony is supported by the testimony of Rich Hart, a quality assurance coordinator in Blytheville from 2007 to 2010, indicating that recipe development necessary to produce higher grades of pipe requires fine tuning of a number of variables.

III. CONCLUSIONS OF LAW

For the reasons set forth below, it is determined that Ajax breached the contract and is liable to IPSCO in the amount of $5,162,298.55.

A.  Breach of Contract

Based upon the testimony and credibility of trial witnesses and the trial exhibits, it is concluded that Ajax breached its contract with IPSCO.

A breach of contract claim requires: (1) the existence of a enforceable contract between the parties; (2) an obligation on the part of the defendant; (3) a breach of that obligation; and (4) damages resulting from the breach. *Rabalaias v. Barnett*, 683 S.W. 2d 919, 921 (Ark. 1985). The parties have never disputed that they entered into an enforceable contract. They have, however, disputed what Ajax's obligations were under that contract.

Ajax's position, in part, is that the contract only required it to provide IPSCO with equipment capable of heating and cooling, which it did. Although Wanda Stankewich testified that Ajax was only obligated to provide equipment that was capable of heating and cooling because other processes unrelated to the Ajax equipment were necessary to create

the higher grades of pipe required by IPSCO, this position is unconvincing in light of other testimony presented. The testimony and documents entered into evidence indicate that Ajax knew that IPSCO required equipment that provided a uniform heating and cooling process. It is also clear that Ajax knew that IPSCO's intended purpose was to create higher grades of pipe, instilled with certain qualities required for use in the oil and gas industry. It is also clear that the contract established a 96 feet per minute production rate for the smaller grades of tubing. Ajax has also argued that the failure of the equipment was the sole result of IPSCO's own internal errors caused by its failure to maintain the equipment or by using inferior green pipe. This, however, is also unconvincing.

Based on the witnesses' testimony, as well as the documents entered into evidence, it is concluded that Ajax breached its contractual obligations by failing to provide IPSCO with equipment that performed at the contractual rates and specifications. While it is true that the Ajax equipment, standing alone, could not ensure that a piece of pipe had all the necessary properties required by IPSCO's end customers, the failure of the Ajax equipment to perform as required under the contract specifications rendered piping defective and unfit for use in the oil and gas industry. Based on twelve days of testimony and the credibility of witnesses and the exhibits entered into evidence, it is concluded that Ajax breached its obligations to IPSCO under the contract.                                 .

B.     Damages

IPSCO alleges that, as a result of Ajax's breach of contract, it incurred $9,539,616.00

in damages and seeks prejudgment interest.

IPSCO bears the burden of proving its damages. "[O]nce the existence, nature, and cause of damages" has been established, recovery should not be denied simply because the exact amount of damages may be difficult to ascertain. *Ark. Rice Growers v. Alchemy Indus., Inc.*, 797 F.2d 565, 571 (8th Cir. 1986). Here, IPSCO alleges four categories of damages: (1) $8,345,194.92 in costs incurred as a result of sending tubing to outside processors because the Ajax equipment was not functioning; (2) $784,964.82 in costs incurred as a result of selling pipe downgraded as a result of the Ajax equipment at a reduced price; (3) $306,379 in costs incurred by modifying the equipment in an attempt to improve its performance; and (4) $103,000 in costs incurred as a result of hiring consultants in an attempt to bring the equipment into conformance with the contract specifications.

The documents offered by IPSCO to prove its damages have been reviewed and appear to accurately reflect the costs incurred by IPSCO because it was unable to produce quality heat-treated pipe. Although the exhibits supporting IPSCO's damages accurately reflect the expenses paid by IPSCO, the damages sought must be reduced because not all of the expenses incurred are directly attributable to the breach.

IPSCO is awarded $3,967,954.73 for costs incurred in sending pipe to outside processors. Although IPSCO requests $8,345,194.92 for these costs, its request is reduced by $4,377,240.19, which is the amount of costs it incurred from outside heat treaters during the first eight months that the AJAX equipment was up and running. This reduction is based

on the credible testimony that, even if the Ajax equipment had performed to the contract specifications after its startup in September of 2007, it would still have taken IPSCO time to hone its recipes and maximize its productivity, which would have been required before IPSCO could eliminate the need for sending pipe to outside processors. Based on the credible testimony of Bruce Urband, an expert offered by Ajax, along with the other testimony and trial exhibits, it is concluded that reducing IPSCO's damages by eight months is appropriate.

IPSCO also requests $784,964.82 in damages for the pipe it had to downgrade as a result of the Ajax equipment, $306,379 in expenses it incurred in modifying the Ajax equipment to improve performance, and $103,000 it paid to outside consultants. Based on the trial testimony and the documents submitted into evidence, these damages are credible and should be awarded to IPSCO.

Additionally, IPSCO seeks prejudgment interest, which is "compensation for recoverable damages wrongfully withheld from the time of the loss until judgment." *All-Ways Logistics, Inc. v. USA Truck, Inc.*, 583 F.3d 511, 518 (8th Cir. 2009) (citing *Sims v. Moser*, 284 S.W. 3d 505, 520 (Ark. 2008)). It is allowable when the amount of damages is "definitely ascertainable by mathematical computation, or if the evidence furnishes data that makes it possible to compute the amount without reliance on opinion or discretion." *Id*. This requires a method for fixing the exact value of a cause of action at the time of the occurrence of the event that gives rise to the cause of action. *Id*.

Although it might appear that the amount of damages was definitely ascertainable by merely reviewing the contract and invoices, certain factual determinations were necessary to determine the proper assessment of damages.  These factual determinations preclude a finding that the method for fixing the exact value of this case existed at the time of the breach.  IPSCO's request for prejudgment interest is therefore denied.

For the foregoing reasons, it is concluded that judgment shall be entered in favor of IPSCO and against Ajax in the amount of $5,162,298.55.

IT IS SO ORDERED this 25th day of September 2013.

*/s/ Brian S. Miller*
UNITED STATES DISTRICT JUDGE