**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**
**JONESBORO DIVISION**

**IPSCO TUBULARS, INC.**                                                    **PLAINTIFF**
**d/b/a TMK IPSCO**

v.                          **CASE NO: 3:10CV00021 BSM**

**AJAX TOCCO MAGNETHERMIC**
**CORPORATION**                                                   **DEFENDANT**

## ORDER

This case was tried to the bench between May 6 and May 23, 2013. The parties filed post-trial briefs before making closing arguments on August 16, 2013, and a plaintiff's verdict in the amount of $5,162,298.55 was rendered on September 25, 2013. The Eighth Circuit affirmed the verdict on March 4, 2015, but remanded for specific findings on damages because its review was "'hindered' without additional explanation." *IPSCO Tubulars, Inc. v. Ajax TOCCO Magnathermic Corp.*, 779 F.3d 744, 752 (8th Cir. 2015).

In that almost two years elapsed between the time the case was tried and the issuance of the circuit's opinion, the parties were asked to submit proposed findings of fact as to damages. Having reviewed the parties' proposed findings on damages [Doc. Nos. 198, 201], plaintiff IPSCO Tubulars, Inc.'s proposed findings are adopted as set forth below.[1]

### I. Outside Processing Costs

---

[1] The findings set forth below are taken directly from IPSCO Tabulars, Inc.'s Proposed Findings on Damages [Doc. No. 198] because it accurately states the court's position. Although this is true, for simplicity, this order does not contain quotations to IPSCO's proposed findings.

IPSCO was awarded $3,967,954.74 for costs incurred in sending pipe to outside processors. While these costs included $23,539 in outside processing costs for seamless pipe, they did not include costs for casing. Moreover, these costs were not awarded as consequential damages, but as costs reasonably expended incidentally to Ajax's breach.

  A. <u>Do Outside Processing Costs Include Costs for Casing and Seamless Pipe?</u>

The damages awarded for outside processing costs included the costs for seamless pipe but not for casing.

IPSCO built the Blytheville, Arkansas, heat treat facility to get a stronger foothold in the market for heat treated pipe. Murray Giesbrecht testified that in the mid-2000's, there was a substantial demand for higher grades of oil country tubular goods produced by heat treat process. Test. Giesbrecht, Trial Tr. at 358:4–11, Doc. No. 148. During that period, IPSCO was already producing both electric resistance welded ("ERW") and seamless oil country tubular goods, both of which could be converted to higher API grades through the heat treat process. IPSCO, however, did not have the capacity to produce enough of these goods at API specifications and had to use third-party processors for heat treatment. *Id.* This increased IPSCO's manufacturing costs for heat treated oil country tubular goods. *Id.* IPSCO therefore built the Blythville facility to reduce these costs, and contracted for the heat treat equipment supplied by Ajax as the centerpiece of that facility.

Although IPSCO anticipated that most of the pipe processed at Blythville would be ERW pipe, it also expected to heat treat seamless pipe at the facility. Test. Rick Hart, Trial

2

Tr. 1785:11–1786:1, Doc. No. 154. To this end, IPSCO drafted requirements that outside suppliers would have to meet if they sent pipe to be heat treated at Blytheville, and those requirements applied to both ERW and seamless pipe. *Id.* Moreover, nothing in IPSCO's contract with Ajax limited the use of the Ajax equipment to the heat treatment of ERW pipe. The testimony at trial did not prove that Ajax believed IPSCO would refrain from using its heat treat equipment to produce higher grades of seamless oil country tubular goods.

Stephen Buffo, Ajax's damages expert, testified that IPSCO expended $23,539 in outside processing costs for seamless pipe. Test. Buffo, Trial Tr. 2506:4–6, Doc. No. 157. Based on the credible testimony of Lonnie Barker, IPSCO's employee in charge of outside processing, it was determined that outside processing costs did not include costs for casing. Test. Barker, Trial Tr. 1280:14–16, Doc. No. 151. Accordingly, Thomas Groskopft, IPSCO's damages expert, included outside processing costs for seamless pipe, but not for casing, in the total outside processing costs.

     B.     <u>Outside Processing Costs are Recoverable Damages</u>

Section 12.1 of the parties' contract limits recovery for certain types of consequential damages and provides that consequential damages are not recoverable for "loss of profits, loss of revenue, loss of anticipated business, loss of use, downtime costs or costs of capital suffered or incurred by the Owner or for exemplary or punitive damages. . . ." Gen. Conditions of Contract, Ex. A, § 12.1, Doc. No. 53. Ajax failed to prove its affirmative defense that outside processing costs are unrecoverable consequential damages under section

12.1. Contrary to Ajax's contention, the record indicates that these are not consequential damages.

> *1.  Ajax failed to prove that outside processing costs are unrecoverable consequential damages.*

"Whether damages are consequential is a question of fact." *IPSCO*, 779 F.3d at 751 (quoting *Dickson v. Delhi Seed Company*, 760 S.W. 2d 382, 389 (Ark. Ct. App. 1988)). Ajax had the burden of proving its affirmative defense that outside processing costs were unrecoverable consequential damages. *See Vent v. Johnson*, 303 S.W.3d 46, 52 (Ark. 2009); *Ross v. Garner Printing Co.*, 285 F.3d 1106, 1113 (8th Cir. 2002). IPSCO correctly points out that Ajax did not put on any evidence at trial that satisfactorily shows outside processing costs were one of the consequential damages listed in section 12.1 of the contract.

Defense counsel merely stated during closing arguments that IPSCO's outside processing costs are barred by section 12.1 because they are "premised on the assumption that Ajax's downtime and loss of full use of the equipment required pipe[] to be sent out." Def's Closing Arg., Trial Tr. 2788:3–11, Doc. No. 168. This passing reference is merely conclusory and therefore insufficient to prove that IPSCO's outside processing costs are unrecoverable consequential damages. Importantly, these costs are not for downtime or loss of use because IPSCO was, in fact, able to use the Ajax equipment. Moreover, nothing in the record shows that these were costs for labor or other general overhead items that IPSCO was unable to cover, thereby losing some benefit because it could not use Ajax's equipment at all. The outside processing costs were not incurred because the equipment was shut down,

but because the equipment could not process the heat treated product to the specifications provided by the contract. Test. Giesbrecht, Trial Tr. 2631:1–4, Doc. No. 158; Test. Groscopft, Trial Tr. 2569:18–2570:10, Doc. No. 158.

 2. *Ajax could not prove that IPSCO's outside processing costs are consequential because they were awarded as incidental damages.*

IPSCO's outside processing costs are incidental damages because they were reasonably incurred to avoid the losses that would have resulted from the deficient performance of the Ajax equipment. Buyers of defective goods are permitted to recover incidental damages, which include any reasonable expenses incident to the breach. Ark. Code Ann. §§ 4-2-714, 715. The costs of obtaining substitute performance for equipment that does not perform as contracted are incidental, not consequential, damages. *See Mead Corp. v. McNally-Pittsburg Mfg. Corp.*, 654 F.2d 1197, 1210, 1210 n. 19 (6th Cir. 1981) (costs incurred to obtain substitute performance represent damages falling within the concept of cover, "they would not come under the definition of consequential damages").

In *Mead*, the plaintiff contracted with the defendant for a loading scale meeting the certification requirements of the Inspection Bureau. *Id.* at 1210. The scale provided by the defendant, however, failed to meet these requirements and the Bureau refused to certify it, forcing the plaintiff to incur substantial costs in obtaining alternative weighing services, including transportation costs. *Id.* The court held that these costs did not fall under the definition of consequential damages, but could more appropriately be construed as cost of cover. *Id.* at 1210 n. 19. As such, the court essentially held that these costs were incidental

damages. *See Kohlenberger, Inc. v. Tyson's Foods, Inc.*, 510 S.W.2d 555, 560 (Ark. 1974) (defining incidental damages as costs of cover and any other reasonable expense incident to the breach).

The plaintiff's substitution of the defective performance of the loading scale in *Mead* is similar to IPSCO's substitution of the defective performance of the Ajax equipment. IPSCO contracted with Ajax for equipment capable of heat treating pipe at the rate of 96 feet per minute so that IPSCO could produce API specified pipe for its customers. The equipment provided by Ajax failed to perform as contracted, resulting in production of non-API specified pipe. To prevent some of the losses it would have suffered if it could not produce the API specified pipe, IPSCO was forced to incur substantial expenses to obtain alternative heat treatment. These included transportation and third-party processing costs. Just as in *Mead*, these costs were incurred to prevent further losses and are therefore incidental in nature. Importantly, these damages cannot fit the definition of consequential damages. *Dickson v. Delhi Seed Co.*, 760 S.W.2d 382, 389 (Ark. App. 1988) (defining consequential damages as losses ... which could not have reasonably been prevented by cover or otherwise).

## II. The Downstream Equipment

The evidence shows that IPSCO's downstream equipment never prevented the Ajax equipment from processing pipe at 96 feet per minute. Giesbrecht, Trial Tr. at 419:5–8; Test. Joyner, Trial Tr. at 934:6–8, Doc. No. 150; Test. Manfredi, Trial Tr. at 632:13–21, Doc. No.

149. Moreover, the Blytheville heat treat process is designed to be a continuous process, in which the pipe flows continuously from the beginning of the process to the end of the process. This process can, however, be operated as a detached process, in which there are outlets to which products can be sent at various stages. The outlets would be used to hold product temporarily if a downstream piece of equipment were not operating properly. Manfredi, Trial Tr. 626:23–627:17. Because of IPSCO's ability to operate this way, it would not have needed to send pipe to outside processors even if its downstream equipment had been unable to keep up with the Ajax equipment. Joyner, Trial Tr. at 931:3–18. Consequently, no downstream equipment contributed to IPSCO's need to incur outside processing costs. The evidence does not support Ajax's assertion that downstream equipment constraints prevented its equipment from operating at 96 feet per minute.

While the flume was being enlarged in Spring 2008, IPSCO evaluated cycle times for its downstream equipment to ensure that it would be capable of running at the 96 feet per minute that the Ajax equipment was expected to run. Joyner, Trial Tr. at 931:3–18. Although enlarging the flume did not enable the Ajax equipment to run at 96 feet per minute, by the time the flume was enlarged in June, 2008, credible testimony shows that every piece of IPSCO's equipment was capable of running at 96 feet per minute. Moreover, when integrated together, all of IPSCO's equipment could run at 96 feet per minute. Manfredi, Trial Tr. 625:6–626:13; Joyner, Trial. Tr. 931:3–18. Accordingly, it was determined that IPSCO's downstream equipment could run at 96 feet per minute independently from the Ajax

7

equipment.

### III. Costs Incurred as a Result of Selling Downgraded Pipe

Whether the costs incurred by IPSCO in selling the downgraded pipe at a reduced price amounts to lost revenue under section 12.1 of the General Conditions was not considered in awarding IPSCO $784,964.82 in damages for the downgraded pipe because neither party addressed the issue. As discussed above, whether this award constitutes lost revenue, and is thereby barred by section 12.1, is an affirmative defense for which Ajax had the burden of proof. *See Vent*, 303 S.W.3d at 52. Ajax failed to carry its burden. It must be noted that had Ajax sufficiently raised this issue at trial, however, it would have been determined the $784,964.82 award represents lost revenue because it was awarded as the difference between the price IPSCO received for the downgraded pipe and the price it would have received for the pipe as specified.

Although this award could have included the costs of shipping the lower grade of pipe for resale and for finding new buyers, the record lacks evidence supporting that conclusion. Consequently, had Ajax properly raised this affirmative defense at trial, it would have been successful because the $784,964.82 was awarded for lost revenue, which is barred under 12.1.

### IV. Application of the Refinement Period to Damages for the Reduced Selling Price of Downgraded Pipe

IPSCO incurred damages in the form of outside processing costs because the Ajax equipment was not capable of heat treating pipe at the contractually specified productivity

rate of 96 feet per minute. Damages were not awarded for the first eight months of production because the evidence indicated that it typically takes eight months to commission and refine this type of equipment to maximize its level of productivity, and to reach its specified production rate. This eight-month refining period, however, does not apply to damages awarded for the reduced selling price for downgraded pipe.

Ajax attempted to place blame for defects that led to downgraded pipe on issues such as IPSCO's material chemistry, incoming bent pipe, pipe surface imperfections, wall thickness variations, and improper maintenance procedures. That evidence, however, was unconvincing when considered alongside the trial exhibits, see IPSCO Post Trial Br. ¶4, Doc. No. 163, and the credible testimony. Heat treating equipment that damages the pipe being processed is far different from heat treating equipment that must be refined to enable it to run at its specified productivity rate. The most reasonable inference from all the evidence is that while a refinement period might have been necessary to enable IPSCO to maximize the speed at which the equipment could process pipe, no refinement period should have been necessary to prevent the equipment from damaging pipe to the point that it could not be sold for its intended purpose. While there was testimony related to the connection between the refinement period and productivity, no witness provided credible testimony that a refinement period was necessary to enable the heat treat equipment to process pipe without damaging it.

ENTERED this 24th day of November 2015.

_____
UNITED STATES DISTRICT JUDGE